**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Warren Dale KEEFER,
Defendant-Appellant.**

**No. 85–1610.**

United States Court of Appeals,
Sixth Circuit.

Argued May 2, 1986.

Decided Sept. 2, 1986.

Rehearing and Rehearing En Banc Denied
Oct. 16, 1986.

---

Larry C. Willey, Charles S. Rominger (argued), Rominger and DeWitt, Grand Rapids, Mich., for defendant-appellant.

John C. Bruha (argued), Asst. U.S. Atty., Grand Rapids, Mich., for plaintiff-appellee.

Before CONTIE and RYAN, Circuit Judges, and BROWN, Senior Circuit Judge.

RYAN, Circuit Judge.

Defendant-appellant Warren Dale Keefer appeals his jury conviction of causing a false statement to be made to a United States agency in violation of 18 U.S.C. §§ 1001 and 2. The indictment charged two counts of aiding and abetting or causing false statements to be made on applications for mortgagor approval and commitment for mortgage insurance which were submitted to the Department of Housing and Urban Development, Federal Housing Administration (FHA), for property located in East Grand Rapids, Michigan, and Clearwater, Florida. Appellant contends: (1) that the district court erred in refusing to dismiss the case as required by the Speedy Trial Act, 18 U.S.C. § 3161 *et seq.;* (2) that

his conviction under 18 U.S.C. § 2 must be reversed because there was no evidence that another person committed the predicate felony proscribed by 18 U.S.C. § 1001; (3) that the district court erroneously ruled that certain of the false statements were material as a matter of law; and (4) that the district court should have declared a mistrial based on instances of asserted prosecutorial misconduct.

We hold that, (1) pursuant to the Supreme Court's recent decision in *Henderson v. United States,* ── U.S. ──, 106 S.Ct. 1871, 90 L.Ed.2d 299 (1986), the Speedy Trial Act was not violated; (2) appellant was properly convicted under 18 U.S.C. §§ 2(b) and 1001 even though the person appellant caused to sign the mortgage documents may have been guiltless under § 1001; (3) the false statements in question were material as a matter of law; and (4) appellant's conviction should not be reversed based on asserted prosecutorial misconduct.

## I.

In 1979, appellant resided in Holland, Michigan, where he operated the Netherlands Inn. In May of that year, Terry McLean arrived in Holland at appellant's invitation. McLean had escaped from a California prison camp in June of 1978 where he had been serving a sentence for burglary.[1] After his escape, he used the name Theodore John McCall to avoid detection and obtained several pieces of identification in that name. McLean told appellant that he had been paroled but, in June of 1979, appellant learned that McLean had escaped from custody. Appellant, who had known McLean since 1978, hired him as a maintenance man, paying him about $100 per week. McLean worked at the Netherlands Inn for about six weeks, and then worked for appellant renovating another hotel in Ionia, Michigan, for approximately ten weeks.

### A

While McLean was working at the Netherlands Inn, appellant suggested they buy a home in Florida for a winter retreat, a new four-bedroom house in Clearwater. McLean, using the name "McCall," signed the purchase agreement. The agreement specified that the house was to be financed with a FHA insured mortgage loan from a mortgage company in Florida. A loan application package prepared by the mortgage company was sent to "McCall" in Michigan. According to McLean's testimony, appellant typed the application and asked McLean to sign it, using the "McCall" alias. McLean did so, without reading the application. The indictment alleged that the application falsely stated:

1. That the mortgagor's name on said property was Theodore J. McCall;

2. That the mortgagor would be the occupant of the property;

3. That the mortgagor was the manager of the Netherlands Inn in Holland, Michigan;

4. That the mortgagor had been employed at the Netherlands Inn for three years;

5. That the mortgagor's monthly income was $2,000.00;

6. That the mortgagor owned furniture and personal property worth $7,000.00;

7. That the mortgagor owned tools worth $1,500.00;

8. That the mortgagor owned a 1974 Mercedes-Benz automobile worth $8,500.00; and

9. That the mortgagor was being transferred to Tampa, Florida, effective September 1, 1979, at an annual salary of $24,000.00.

McLean testified that all of these statements were false. After signing the application, McLean gave it back to appellant, and it was mailed to the mortgage company in Florida.

---

1. McLean, who had been convicted of various crimes from 1970 to 1982, testified for the government under an immunity agreement.

The mortgage company also sent verification forms, which had been signed in blank by "McCall," to the applicant's employer (appellant) and certain banking institutions. The mortgage company received a verification form back from the Netherlands Inn, bearing the same type style as the loan application, indicating that "McCall" had been employed there as a manager for three years at a current salary of $2,000.00 per month, and that he was being transferred to Tampa, Florida, effective September 1, 1979. Then, using the information contained on the loan application and the verification forms, the mortgage company prepared an application for Mortgagor Approval and Commitment for Mortgage Insurance, for submission to the FHA. John Gaskin, then acting chief of mortgage credit at the Tampa, Florida, insuring office of the FHA, Department of Housing and Urban Development, reviewed and approved the application, and issued a commitment for mortgage insurance. Gaskin testified that he would not have issued the commitment had he known that the applicant's name was not Theodore J. McCall and that the applicant did not intend to occupy the property as a permanent residence. Gaskin testified that had he known that certain of the other statements were false, it would have been significant in his decision whether to approve the loan, but that the statement about the 1974 Mercedes-Benz would not have been significant if the applicant had "reasonable transportation."

After the closing on the Florida house, appellant told McLean that they would have to rent it. Posing as Mr. McCall, appellant rented the house to a third party. Then appellant, his brother, Charles Keefer (a/k/a Chuck Galloway), Charles Keefer's wife, and McLean went to a bank in Clearwater where, according to McLean, appellant had him sign a deed transferring the house to B.J. Galloway, under threat of exposing McLean to California authorities.

McLean received no money for the transaction.

**B**

Before going to Florida, appellant had made an offer to purchase a house in East Grand Rapids, Michigan, and signed the purchase agreement "G.H. Keefer for Ted McCall."[2] After the owners made a counteroffer, appellant brought McLean to see the house, and McLean signed the counteroffer in the "McCall" name.

On August 31, 1979, appellant and McLean went to a mortgage company in Grand Rapids to apply for a FHA insured mortgage loan on the house in East Grand Rapids. Appellant answered most of the loan officer's questions, claiming to be McLean's business manager. The application contained the following false statements:

1. That the mortgagor's name on said property was Theodore J. McCall;
2. That the mortgagor would be the occupant of the property;
3. That the mortgagor was the manager of the Netherlands Inn in Holland, Michigan;
4. That the mortgagor had been employed at the Netherlands Inn for three years;
5. That the mortgagor's monthly income was $2,750.00;
6. That the mortgagor owned personal and household goods worth $15,000.00;
7. That the mortgagor owned a 1974 Ford automobile worth $2,000.00; and,
8. That the mortgagor did not own other real estate.

Verification forms were sent out, and the mortgage company received an employment form from the Netherlands Inn verifying the employment information on the application. The mortgage company then prepared the FHA application for Mortgagor Approval and Commitment for Mortgage Insurance, including the information listed on the loan application. McLean,

---

2. Besides Warren Dale Keefer, appellant also used the names "Gerrit Keefer" and "G.H. Keef- er."

alias Theodore John McCall, signed the FHA application on September 19, 1979, without reading it, and it was submitted to the FHA office in Grand Rapids.

Mildred Scanlon, then a mortgage loan processor with the FHA, reviewed the mortgage application for the property in East Grand Rapids, and issued a commitment for mortgage insurance. She testified that she would not have issued the commitment if she had known that the applicant's name was not Theodore J. McCall, and that it would have been significant if she had known of the falsity of the statements regarding the manager position, length of employment, income, and value of personal goods. Mrs. Scanlon testified that the statement about the ownership of a 1974 Ford was not significant in this particular instance because, in response to FHA's inquiry regarding an outstanding automobile loan, the mortgage company had informed the FHA office that the loan was for a 1979 Oldsmobile which had been omitted from the application.[3] She testified that if the applicant owned neither a 1974 Ford nor a 1979 Oldsmobile, it would have been significant because she would have wondered how the applicant could have commuted to work in Holland from Grand Rapids. Mrs. Scanlon also testified that it would have been significant if she had known that the applicant had just obtained another FHA occupant mortgage for a house in Florida.

The sale of the East Grand Rapids property was closed on October 25, 1979, with McLean signing the closing documents and appellant providing the check for closing costs. A deed to McCall was recorded November 1, 1979, but McLean testified that he never received the deed. On November 1, 1979, McLean signed a deed transferring the property to B.J. Galloway. McLean received nothing for the property.

## II.

It is necessary to describe the procedural history of this lawsuit in some detail in order to do justice to the appellant's speedy trial claim.

On April 19, 1984, a two-count indictment was filed against appellant, and he appeared for arraignment on April 30, 1984, pleading not guilty. On May 8, 1984, appellant filed a motion for discovery and a request under Fed.R.Crim.P. 12(d)(2) that the government give notice of its intent to use certain evidence. On May 21, 1984, the district court filed a pretrial order stating that all motions should be filed by June 1, 1984, and scheduling a pretrial conference for June 7, at which time a hearing on all pending motions would be held, and proposed voir dire and jury instructions should be submitted. The trial was scheduled to begin on June 19, 1984; provided, however, if the case did not begin on that date, the parties were to remain ready for trial.

On May 24, 1984, the government filed its response to the motions filed by appellant on May 8. On May 30, appellant filed several more discovery-related motions, and a motion to strike alleged surplus in the indictment. On June 1, 1984, appellant filed a motion to continue the trial until September, 1984, because of a pending criminal proceeding against him in California that was scheduled for preliminary examination on July 10, 1984, which appellant expected would last the month of July. On June 6, 1984, the government responded to this motion, stating that it did not object to a reasonable continuance provided the requirements of the Speedy Trial Act were met, but that it opposed delaying the trial until September.

On June 7, 1984, the scheduled pretrial conference was held, and the court heard arguments on the motion for continuance. After appellant's counsel stated that "the defense obviously had understood that the motion would waive any kind of arguments subsequent to any claim that there has

---

**3.** This statement was also false. In fact, McLean purchased a 1979 Chrysler Cordoba on September 24, 1979, after the mortgage application was submitted to the FHA office. It is not clear from the record where the mortgage company got the information about the 1979 Oldsmobile.

been any violation of the Speedy Trial Act," the court granted the continuance, based upon appellant's motion and the crowded condition of the court's docket.

Next, the subject of the pending pretrial motions was taken up. Although the defense was prepared to argue the motions, the government had not yet responded to the motions filed May 30. The government requested that the motions be held in "abeyance" pending its responses. The court agreed to reschedule oral argument on the motions on a later date after the government had had a chance to respond. When defense counsel stated that he would be leaving for California on or before July 5, the court stated that it would attempt to schedule the motions before that date.

On June 12, 1984, the court entered an order continuing trial "to a date to be determined by the court in the September term," directing production of certain documents by the government, and ordering that "all other pending motions shall be heard by the Court on a date to be set."

On June 21, 1984, the government filed a superseding indictment, identical to the original in all respects except that it added another alleged false statement to Count 1. Appellant was arraigned on this indictment on July 23, after his return from California, and, on July 25, 1984, he filed a waiver of personal appearance for any hearings scheduled for oral argument on the pending motions.

There was no further activity of record in this case until November 28, 1984, when an order issued scheduling the trial for January 7, 1985, as the number two case on the criminal docket. On December 21, 1984, the government filed its proposed voir dire, jury instructions, and trial brief. On December 28, the government advised the court by letter that it was unable to locate an essential witness, Terry McLean, and on January 2, 1985, the government filed a motion for continuance on this basis.

Trial did not commence on January 7, and the parties were informally notified that the case had been rescheduled for February 4, 1985. On January 11, 1985, defendant filed a motion to dismiss, alleging a violation of the Speedy Trial Act. A hearing was held on January 18 on both the government's motion for a continuance, which defendant opposed, and defendant's motion to dismiss, which the government opposed. The motions were taken under advisement by the court.

On February 4, 1985, a hearing was held on all pretrial motions which had been pending since May, 1984. Most of appellant's discovery-related motions were denied. After the hearing, the court filed an opinion and order denying appellant's motion to dismiss on speedy trial grounds. Trial of the case began that afternoon.

At the close of the government's case, appellant made a motion for judgment of acquittal pursuant to Fed.R.Crim.P. 29(a) on the ground that the government had failed to prove all the elements of the crimes charged. The district court, after hearing oral argument, denied the motion, ruling "that there is sufficient evidence on the record from which a jury could reasonably find beyond a reasonable doubt that the defendant is guilty of each of the two counts in the indictment."

After closing arguments, and before instructing the jury, the court ruled, as a matter of law, that all of the alleged false statements in each of the counts of the indictment were material, except for the statement regarding the ownership of $1,500 worth of tools, which the court determined was immaterial.

After the jury was instructed, appellant renewed his motion for judgment of acquittal. In addition to the sufficiency of the evidence claim, appellant contended that the government had not proven the materiality of all of the allegedly false statements. The court denied the motion. Appellant also objected to the court's refusal to give his proposed jury instruction No. 16 regarding criminal responsibility under 18 U.S.C. § 2.

On February 22, 1985, the jury returned a verdict of guilty on both counts. Sentencing was deferred, at appellant's re-

quest, pending disposition of the California case, and, on July 12, 1985, appellant was sentenced in this case to a two year term of imprisonment on Count 1, and five years probation on Count 2. Appellant is free on bond pending this appeal.

### III.

"The Speedy Trial Act, 18 U.S.C. § 3161 *et seq.* (1982 ed. and Supp. II), as amended in 1979 and in 1984, commands that a defendant be tried within 70 days of the latest of either the filing of an indictment or information, or the first appearance before a judge or magistrate." *Henderson v. United States,* 476 U.S. ——, 106 S.Ct. 1871, 90 L.Ed.2d 299 (1986).

Section 3161(h)(1)(F) excludes from the 70–day period:

(1) Any period of delay resulting from other proceedings concerning the defendant, including but not limited to—

\*      \*      \*      \*      \*      \*

(F) delay resulting from any pretrial motion, from the filing of the motion through the conclusion of the hearing on, or other prompt disposition of, such motion.

Appellant's position is that much of the time excluded by the trial court from the period between the arraignment and the trial is not properly excludable under the Speedy Trial Act because the court unreasonably delayed trial of the case by unnecessarily delaying hearing and decision of the pretrial motions and that only delay reasonably necessary to prompt disposition of pending motions may be excluded.

The Government responds that the statute excludes "[a]ny period of delay" between filing and "hearing on, or other prompt disposition" of the pretrial motion, and not just that which is "reasonably necessary." Several courts of appeals have limited the exclusion under § 3161(h)(1)(F) to delays that are "reasonably necessary." *United States v. Ray,* 768 F.2d 991, 998 (8th Cir.1985); *United States v. Mitchell,* 723 F.2d 1040, 1047 (1st Cir.1983); *United States v. Janik,* 723 F.2d 537, 543 (7th Cir.1983); *United States v. Novak,* 715 F.2d 810, 819 (3d Cir.1983), *cert. denied,* 465 U.S. 1030, 104 S.Ct. 1243, 79 L.Ed.2d 694 (1984); *United States v. Cobb,* 697 F.2d 38 (2d Cir.1982). Other courts of appeals have refused to so limit § 3161(h)(1)(F), holding that all delay, from the filing of a pretrial motion through the hearing thereon, is automatically excluded. *United States v. Henderson,* 746 F.2d 619 (9th Cir.1984), *aff'd,* 476 U.S. ——, 106 S.Ct. 1871, 90 L.Ed.2d 299 (1986); *United States v. Horton,* 705 F.2d 1414 (5th Cir.), *cert. denied,* 464 U.S. 997, 104 S.Ct. 496, 78 L.Ed.2d 689 (1983); *United States v. Stafford,* 697 F.2d 1368 (11th Cir.1983).

The Supreme Court resolved this split of authority in *Henderson,* which was decided after this case was submitted for decision. In *Henderson,* 106 S.Ct. at 1876, the Court held that:

Congress intended subsection (F) to exclude from the Speedy Trial Act's 70–day limitation all time between the filing of a motion and the conclusion of the hearing on that motion, whether or not a delay in holding that hearing is "reasonably necessary."

The Court noted first that "[t]he plain terms of the statute appear to exclude all time between the filing of and the hearing on a motion whether that hearing was prompt or not." *Id.* at 1874–75. Moreover, said the Court, "Congress clearly knew how to limit an exclusion: in § 3161(h)(7), Congress provided for exclusion of a 'reasonable period of delay when the defendant is joined for trial with a codefendant as to whom the time for trial has not run and no motion for severance has been granted.' " *Id.* at 1875. In contrast, "every other provision in § 3161(h) provides for exclusion of 'any period of delay.' " The Court agreed with the Ninth Circuit in *Henderson* that the difference between subsection (7) and subsections (1) through (6) "is a strong indication that exclusion of the periods defined in (1)–(6) was intended to be automatic." *Id.* (quoting *United States v. Henderson,* 746 F.2d

619, 622 (9th Cir.1984), *aff'd,* 476 U.S. ——, 106 S.Ct. 1871, 90 L.Ed.2d 299 (1986) ).

*Henderson* controls our disposition of appellant's speedy trial contention. All of the time from the filing of appellant's pretrial motions until the hearing thereon is automatically excludable under § 3161(h)(1)(F) of the act.

■ We are left then with the duty to calculate the number of nonexcludable days before the commencement of the trial in this case. The district court correctly held, and the parties agree, that the speedy trial clock began to run on May 1, 1984, the first day after appellant's arraignment on the original indictment. On May 8, 1984, appellant filed his first set of discovery motions. The district court properly held, and the parties agree, that the period from May 8, 1984, through June 7, 1984, is excludable under § 3161(h)(1)(F) as delay associated with pretrial motions. On June 7, 1984, the court granted appellant's motion for a continuance. The district court found that the parties agreed that the period from June 7, 1984, through September 30, 1984, was "excludable as a result of defendant's requested continuance and waiver of the Speedy Trial Act limitations during the continuance." We need not decide whether this period of delay is excludable for the reasons stated by the district court,[4] since we hold that all of the time from June 7, 1984, through February 4, 1985, is excludable under § 3161(h)(1)(F). On February 4, 1985, the district court heard and decided all pending pretrial motions, including those filed on May 8, 1984. Trial began that afternoon. Consequently, this case involves only seven nonexcludable days (May 1 through May 8, 1984). The Speedy Trial Act was not violated.

### IV.

The original and superseding indictments charged appellant with aiding and abetting and/or causing a violation of 18 U.S.C. § 1001, thus making him criminally liable as a principal under 18 U.S.C. § 2, which provides:

> (a) Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal.
>
> (b) Whoever willfully causes an act to be done which if directly performed by him or another would be an offense against the United States, is punishable as a principal.

The government's primary theory at trial was that appellant *caused* the making of the false statements to the FHA in violation of § 2(b). Appellant, relying on *United States v. Aarons,* 718 F.2d 188 (6th Cir.1983), contends that, in order for a defendant to be properly convicted of aiding and abetting *or* causing a violation of 18 U.S.C. § 1001, there must be proof, in either case, that the person "aided or abetted" or "caused" to violate § 1001 actually committed the predicate felony proscribed by § 1001. Appellant contends that, in light of McLean's testimony that he did not read the loan applications and other documents he signed, he did not have the requisite knowledge or intent to deceive required by § 1001 and thus could not be guilty of committing the predicate felony. *See Aarons,* 718 F.2d at 190; *United States v. Markey,* 693 F.2d 594, 596 (6th Cir.1982).

In *United States v. Lester,* 363 F.2d 68 (6th Cir.1966), *cert. denied,* 385 U.S. 1002, 87 S.Ct. 705, 17 L.Ed.2d 542 (1967), this court, upholding the appellants' conviction for conspiring willfully to cause innocent police officers to act under color of law to deprive another of his civil rights, stated:

> It has been beyond controversy, ... at least since the 1951 amendment to 18 U.S.C. § 2(b), that the accused may be convicted as causer, even though not legally capable of personally committing the act forbidden by a Federal statute, and *even though the agent willfully caused to do the criminal act is himself guiltless of any crime.*

---

**4.** Appellant contends that his waiver should be construed as extending only until September 1, 1984, the commencement of the September term.

*Lester,* 363 F.2d at 73 (emphasis added).[5] This view is supported by decisions from other circuits, *see e.g., United States v. Ruffin,* 613 F.2d 408, 412 (2d Cir.1979); *United States v. Levine,* 457 F.2d 1186 (10th Cir.1972), as well as the legislative history of 18 U.S.C. § 2.[6] *See also* Annot., 52 A.L.R.Fed. 769 (1981). In *United States v. Murph,* 707 F.2d 895 (6th Cir.), *cert. denied,* 464 U.S. 844, 104 S.Ct. 145, 78 L.Ed.2d 136 (1983), this court upheld the appellant's conviction under 18 U.S.C. §§ 2(b) and 287, for willfully causing a "tax return discounter" to submit a fraudulent tax return to the Internal Revenue Service. There was no indication in *Murph* that the discounter had knowledge of the fraudulent nature of the return. *Lester* and *Murph* thus require that we reject appellant's argument that his conviction should be reversed because the government's proofs arguably fail to show that McLean had the requisite *mens rea* for a § 1001 violation.

Appellant contends, nevertheless, that *Aarons* mandates reversal of his conviction. The defendant in *Aarons* was convicted of causing a false statement to be made to the Small Business Administration. The false representations were made jointly by three other individuals: Neagley, Fosth, and Busard. Aarons contended on appeal that the evidence was insufficient to support his conviction under 18 U.S.C. §§ 1001 and 2(b).[7]

The statement in *Aarons* relied upon by appellant is:

**5.** The 1951 amendment to § 2(b) changed the phrase, in § 2(b), "which if directly performed by him" to "which if directly performed by him *or another.*" *Lester,* 363 F.2d at 72–73.

**6.** The report of the House Committee on the Judiciary concerning the 1947 revision of Title 18 of the United States Code, states, with respect to § 2:

The section as revised makes clear the legislative intent to punish as a principal not only one who directly commits an offense and one who "aids, abets, counsels, commands, induces or procures" another to commit an offense, but also anyone who causes the doing of an act which if done by him directly would render him guilty of an offense against the United States.

Aarons could be convicted here only if the prosecution proved that Busard, Neagley, or Fosth committed the predicate felony proscribed by 18 U.S.C. § 1001. *United States v. Hoffa,* 349 F.2d 20, 40 (6th Cir.1965), *aff'd,* 385 U.S. 293, 87 S.Ct. 408, 17 L.Ed.2d 374 (1966).

718 F.2d at 190. The *Aarons* court then stated:

The elements of the crime denounced as unlawful by the predicate statute are: (1) the making of a statement; (2) the falsity of such statement; (3) knowledge of the falsity of the statement; (4) relevance of such statement to the function of a federal department or agency; (5) that the false statement was material. *United States v. Fitzgibbon,* 619 F.2d 874, 879 (10th Cir.1980). A review of the evidence reveals that Busard, Neagley and Fosth violated the "making" clause of 18 U.S.C. § 1001.

*Id.*

The court went on, however, to reverse Aarons' conviction on the ground that there was insufficient evidence that Aarons "caused" the making of the false statements. The proofs showed no overt acts on Aarons' part, nor sufficient evidence "that Aarons associated himself with the criminal venture involved here—i.e., the making by Busard, Neagley and Fosth of false statements to the SBA...." *Id.* at 192. Distinguishing Murph, the *Aarons* court stated:

It removes all doubt that one who puts in motion or assists in the illegal enterprise but causes the commission of an indispensable element of the offense *by an innocent agent or instrumentality,* is guilty as a principal even though he intentionally refrained from the direct act constituting the completed offense. H.R.Rep. No. 304, 80th Cong., 1st Sess. 145 (1947) (emphasis added).

**7.** The court noted that the prosecution conceded that Aarons could not have been found guilty of personally making the false statement, nor of aiding or abetting its making under § 2(a). The court, therefore, limited its "discussion to whether or not the evidence was sufficient to sustain the conviction under § 2(b)." *Aarons,* 718 F.2d at 189–90.

This is not a situation analogous to that in *United States v. Murph*, 707 F.2d 895 (6th Cir.1983), where the appellant willfully caused another person to submit the Internal Revenue Service a tax return which fraudulently claimed an entitlement to a refund. There, appellant had sold his right to receive the proceeds of his supposed refund to a "tax return discounter." Therein, we said:

> The defendant knew when he sold the return to the discounter that the discounter was buying it for the purpose of presenting it to the government for a refund. This further [overt] act on behalf of the discounter was clearly understood and foreseen by the defendant and thus the defendant "caused" the return to be presented within the meaning of the Act. *Compare Pereira v. United States*, 347 U.S. 1, 8–9, 74 S.Ct. 358, 362–363, 98 L.Ed. 435 (1954).

Here, the evidence did not reflect that Aarons had understood or foreseen that the false statement would be made and submitted to the SBA.

*Aarons*, 718 F.2d at 190–91.

Quite plainly, the statement in *Aarons* relied upon by appellant is contrary to this court's interpretation of § 2(b) in *Lester* and *Murph*. Moreover, the citation to *Hoffa*, 349 F.2d at 40, in *Aarons* is inappropriate because *Hoffa* involved a conviction under § 2(a) for aiding and abetting, not § 2(b). Unlike a "causing" conviction under § 2(b), "[i]t is generally recognized that there can be no conviction for aiding and abetting someone to do an innocent act." *Shuttlesworth v. Birmingham*, 373 U.S. 262, 265–66, 83 S.Ct. 1130, 1132, 10 L.Ed.2d 335 (1963), and cases cited therein. *See also United States v. Campa*, 679 F.2d 1006, 1013 (1st Cir.1982); *Ruffin*, 613 F.2d at 412; *United States v. Bryant*, 461 F.2d 912, 919–20 (6th Cir.1972). Thus, the sentence in *Aarons* relied upon by appellant erroneously states the law under § 2(b). That statement, however, is *obiter dictum* in light of the facts of *Aarons* and the ground on which Aarons' conviction was reversed. There simply was insufficient evidence that Aarons *caused* the making of the false statements, which the proofs showed were made jointly by Busard, Neagley and Fosth.

■ Appellant in this case does not challenge the sufficiency of the evidence with respect to the "causing" element. *Aarons*, therefore, is distinguishable from this case. We hold that the government was not required to prove that McLean actually committed the predicate felony proscribed by § 1001.

■ Consistent with that conclusion, we hold that the district court properly refused appellant's proposed jury instruction No. 16.[8] Instead, the district court gave the following instruction:

> The guilt of an accused in a criminal case may be established without proof that he personally did every act constituting the offense alleged. The law recognizes that ordinarily, anything a person can do for himself may also be accomplished by him

---

**8.** Appellant's proposed instruction was identical to the court's instruction except for the following paragraphs:

> Notice, however, that before any defendant may be held criminally responsible for acts of others it is necessary that the accused willfully associate himself in some way with the criminal venture, and willfully participate in it as he would in something he wishes to bring about; that is to say, that he willfully seek by some act of [sic] omission of his to make the criminal venture succeed *and that he shared in the criminal intent of the principal.*
>
> \* \* \* \* \* \*

> In other words, you may not find the defendant guilty unless you first find beyond a reasonable doubt that every element of the offense as defined in these instructions was committed by some person or persons. And second that the defendant willfully participated in its commission by committing acts designed to aid in the success of the venture *with the same criminal intent as the principal* and that those acts and the accompanying intent occurred *before* the crime was committed. The applicable dates are on or about September 19, 1979 for Count 1 and on or about July 23 to on or about August 3, 1979 for Count 2.
>
> (Emphasis added).

through direction of another person as his agent or by acting in concert with or under the direction of another person or persons in a joint effort or enterprise.

Title 18 United States Code Section 2 provides:

"(a) Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission is punishable as a principal."

"(b) Whoever willfully causes an act to be done which is directly performed by him or another would be an offense against the United States is punishable as a principal."

So if the acts or conducts of an agent, employee or associate of the defendant are willfully directed or authorized by him, or if the defendant aids and abets another person by willfully joining together with such person in the commission of a crime, then the law holds the defendant responsible for the acts and the conduct of such other persons just as though he had committed the acts or engaged in such conduct himself.

Notice, however, that before any defendant may be held criminally responsible for acts of others, it is necessary that the accused willfully associate himself in some way with the criminal venture and willfully participate in it as he would in something he wishes to bring about. That is to say, he willfully seeks by some act or omission of his to make the criminal venture succeed.

Of course, mere presence at the scene of a crime and knowledge that a crime is being committed are not sufficient to establish that a defendant either directed or aided or abetted the crime unless you find beyond a reasonable doubt that the defendant was a participant and not merely a knowing spectator. It is not sufficient that the defendant may have created the occasion or opportunity for the offense, even though defendant may

have foreseen the consequences. In other words, you may not find the defendant guilty unless you find beyond a reasonable doubt that every element of the offense as defined in these instructions was committed by some person or persons and that the defendant willfully participated in its commission.

The government has argued that the defendant is guilty under two different theories. Unless you unanimously agree that the government has proven beyond a reasonable doubt that the defendant is guilty under the same theory, then you must find the defendant not guilty.

This instruction allowed the jury to convict appellant under either § 2(a) or § 2(b), provided the jury unanimously agreed that appellant was guilty under the same theory. There was no error in the court's refusal to give appellant's proposed instruction, which incorrectly stated the law under § 2(b).[9]

## V.

Appellant's next argument is that the district court erred in ruling that certain of the false statements made in the mortgage loan documents were material as a matter of law under 18 U.S.C. § 1001. Specifically, appellant claims the following statements were immaterial: (1) in count 1 of the indictment, that the applicant owned a 1974 Ford; (2) in count 2, that the applicant owned a 1974 Mercedes-Benz; and (3) also in count 2, that the applicant was the manager of the Netherlands Inn.

Section 1001 provides:

Whoever, in any matter within the jurisdiction of any department or agency of the United States knowingly and willfully falsifies, conceals or covers up by any trick, scheme, or device a material fact, or makes any false, fictitious or fraudulent statements or representations, or makes or uses any false writing or document knowing the same to contain any

---

9. In particular, appellant's requested instruction stated that, in order to find the defendant criminally responsible, the jury must find "that he shared in the criminal intent of the principal."

This instruction is incorrect with respect to the "causing" theory under § 2(b), insofar as it suggests that the person caused or used to commit the crime must have a criminal intent.

false, fictitious or fraudulent statement or entry, shall be fined not more than $10,000 or imprisoned not more than five years, or both.

Materiality "is not an element of the offense that must be proved beyond a reasonable doubt but a 'judicially-imposed limitation to insure the reasonable application of the statute.'" *United States v. Chandler,* 752 F.2d 1148, 1151 (6th Cir.1985) (quoting *United States v. Abadi,* 706 F.2d 178, 180 n. 2 (6th Cir.), *cert. denied,* 464 U.S. 821, 104 S.Ct. 86, 78 L.Ed.2d 95 (1983)). Although materiality is explicitly stated in § 1001 only with respect to the first clause of the statute, "courts have read a materiality requirement into its second clause in order to exclude trivial falsehoods from the purview of the statute." *Abadi,* 706 F.2d at 180 (citing *United States v. Beer,* 518 F.2d 168, 170–71 (5th Cir.1975)); Annot., 49 A.L.R.Fed. 622, § 4 (1980). *Contra United States v. Rinaldi,* 393 F.2d 97, 99–100 (2d Cir.), *cert. denied,* 393 U.S. 913, 89 S.Ct. 233, 21 L.Ed.2d 198 (1968); *see* Annot., *supra,* § 5. The parties correctly note that materiality is a question of law for the court to decide. *Chandler,* 752 F.2d at 1150; *Abadi,* 706 F.2d at 180. "The materiality of a statement rests upon a factual evidentiary showing, but the ultimate decision is a legal one." *Beer,* 518 F.2d at 172. The test for materiality is whether "the false statement 'had a natural tendency to influence, or was capable of influencing, the decision' of the agency." *Chandler,* at 1151 (quoting *Weinstock v. United States,* 231 F.2d 699, 701–02 (D.C.Cir.1956)); Annot., *supra,* 49 A.L.R.Fed. 622, § 3. The statement need not *in fact* influence the agency's decision. *Chandler,* 752 F.2d at 1151. "A materiality determination is subject to complete review on appeal and is not controlled by the clearly erroneous standard." *Id.*

■ The district court's ruling that the statements in question were material is supported by the testimony of the FHA employees who processed the mortgage loans on the two properties, John Gaskin and Mildred Scanlon. Appellant relies on Gaskin's testimony, on cross-examination, that if the application had said "employee" instead of "manager," it would have made no difference in his decision to approve the loan. However, on direct examination, Gaskin testified:

Q. Mr. Gaskin, if the employment information stated on Government's Exhibit Number 12 was not correct, would that have been significant to you in your review of this loan?

A. Yes, sir.

Q. And how would that have been significant?

A. It showed him as a manager of Netherlands Inn with three years on the job. It shows that he should be a stable person and able to carry on the job for—not a fly-by-night.

Q. And if that information were not correct, would you have questioned this loan?

A. Yes, sir. If I knew it was not correct.

Q. Did you know—

A. Or if I had reason to believe that it was not correct.

Moreover, Mrs. Scanlon testified that it would have been significant if she had known that the applicant was not the manager of the Netherlands Inn. Although appellant does not challenge the identical statement in the application for the Michigan property that Mrs. Scanlon processed (Count 1), the test for materiality is an objective one—whether the statement was *capable* of influencing the agency's decision. If the statement is material in one count, it is material in the other, given the similarity of the facts and circumstances surrounding these transactions. We hold that the testimony of Gaskin and Mrs. Scanlon supports the district court's ruling that this statement was material.

Appellant also challenges the statement in Count 2 that the mortgagor owned a 1974 Mercedes-Benz worth $8,500.00. On this point, Gaskin testified:

Q. Mr. Gaskin, if the applicant for that particular loan did not own a 1974 Mercedes-Benz worth $8,500, would that

have been significant in your review of this application?

A. Would you repeat your question.

Q. Sure. If the applicant did not, in fact, own a 1974 Mercedes-Benz worth $8,500, would that have been significant?

A. If he owned reasonable transportation, then it would not have been a cause for rejection of the loan.

Q. What transportation did he—did the applicant indicate on that application?

A. 1974 Mercedes-Benz, showing a value of $8,500.

Q. If the applicant did not own such a vehicle, would that have made a difference on this loan?

A. It would—if I knew it, I would have questioned it.

Appellant argues that the materiality of the statement must derive from its falsity, and that the record shows that McLean in fact owned transportation, although not the particular type represented in the loan application. However, there is no evidence in the record that, at the time the loan application for the Florida property was submitted, August 3, 1979, McLean owned any car. Moreover, even if McLean had owned "reasonable transportation" at the time the application was submitted, Gaskin's testimony supports the district court's ruling that the statement about the Mercedes-Benz was material. Although Gaskin testified that if McLean had owned reasonable transportation, the misrepresentation "would not have been a cause for rejection of the loan," the test for materiality is not whether the agency *actually* relied on the false statement, but whether the statement was *capable of influencing*, or had a natural tendency to influence, the agency's decision. Gaskin testified that if he had known that McLean did not own a 1974 Mercedes-Benz, he "would have questioned it." Thus, the false statement was capable of influencing his decision to approve the loan.

Appellant makes a similar argument with respect to the statement, in Count 1, that the applicant owned a 1974 Ford worth $2,000.00. On direct examination, Mrs. Scanlon testified:

Q. If you had known at the time you were reviewing this application that the applicant did not own the 1974 Ford automobile stated on the application, would that have had any significance for you?

A. Well, not in this particular instance because of the fact that we did make an inquiry back to the mortgage company regarding an outstanding loan of approximately—on this application of $5,952. We requested what it was for, because a '74 Ford would not have that much of an obligation.

\* \* \* \* \* \*

The mortgage company in turn told us that this loan was for a '79 Olds. So the '74 Ford was not taken into consideration because he had a '79 Olds.

Q. If the applicant had owned neither a 1974 Ford nor a 1979 Oldsmobile, would that have been significant?

A. Yes, sir. We would wonder how he could commute to work, to Holland and back home to Grand Rapids.

On cross-examination, Mrs. Scanlon testified that it would not have made any difference if the 1979 Oldsmobile was in fact a 1979 Chrysler Cordoba.

The application for mortgagor approval and commitment for mortgage insurance on the East Grand Rapids property, containing the false statement about the 1974 Ford, was submitted to the FHA on September 19, 1979. On September 21, 1979, the Grand Rapids FHA insuring office inquired about the 1974 Ford. The mortgage company responded by letter dated September 25, 1979, stating that "[t]he car debt ... was in fact for a 1979 Oldsmobile, which was omitted in the list of assets, not for the 1974 Ford." On September 24, 1979, McLean, using the McCall alias, signed a financing agreement on a 1979 Chrysler Cordoba. Appellant cannot point to any evidence in the record that McLean owned a car before this date. Since McLean owned no transportation at the time

the false statement about the 1974 Ford was made to the FHA, that statement was material.

The testimony by Mrs. Scanlon relied upon by appellant, quoted above, merely indicates that she did not actually rely on the statement about the 1974 Ford because she relied instead on the information obtained from the mortgage company about the 1979 Oldsmobile. However, as we have stated, actual reliance is not required to prove materiality under § 1001.

■ We hold, as a matter of law, that the false representation on the FHA mortgage application about the ownership of a substantial and important personal asset such as a car is one capable of influencing, or having a natural tendency to influence, the agency's decision. The fact that the FHA inquired about the 1974 Ford in the first place supports our conclusion.

We hold that all three of the statements challenged by appellant as being immaterial were correctly held by the district court to be material. Therefore, it is not necessary for us to reach appellant's argument that the district court's materiality ruling cannot be harmless error.

## VI.

We have examined the asserted instances of prosecutorial misconduct, and we hold that neither instance deprived appellant of a fair trial, nor affected his substantial rights. Fed.R.Crim.P. 52(a).

Accordingly, appellant's conviction is *affirmed.*